UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

CHARLES FITZGERALD AND )
KENNETH CLINE, )
 )
        Plaintiffs, )
 )
        v. )                    Civil No. 07-16-B-W
 )
WILLARD R. HARRIS, JR., in his )
Capacity as Director of the Maine )
Bureau of Parks and Lands, )
 )
        Defendant )


**RECOMMENDED DECISION ON MOTION TO DISMISS**

Charles Fitzgerald and Kenneth Kline, Maine residents who describe themselves

as "avid wilderness canoeists," have filed an action in this court against Willard Harris,

Jr., in his capacity as the Director of the Maine Bureau of Parks and Lands.  The plaintiffs

seek a declaration that a certain provision of a 2006 Maine State law,  "An Act to Make

Adjustments to the Allagash Wilderness Waterway," is preempted by a 1968 federal

statue, the "Wild and Scenic Rivers Act," the United States Secretary of the Interior

having designated the Allagash Wilderness Waterway as a "wild river area" under this

statute.  The plaintiffs contend that the Maine law – as it pertains to overland motorized

access and the permanency of bridges -- violates the Supremacy Clause of the United

States Constitution.  They want this Court to enjoin the responsible state official from

implementing the offending provisions of the Maine law.

The defendant has filed a motion to dismiss (Docket No. 8), and that motion was referred to me on August 1, 2007. The defendant asserts three reasons why dismissal is warranted. One, the State, as owner of the Allagash Wilderness Waterway, is an indispensable party to the suit, and this suit seeks redress against the State which is shielded by sovereign immunity. Two, the plaintiffs' preemption claim fails on its merits because there is no express or implied conflict with federal law. And, three, there being no private right of action under the Wild and Scenic Rivers Act, the Supremacy Clause does not allow for a mandatory injunction of the kind the plaintiffs' seek.

There is no dispute here that the Wild and Scenic Rivers Act has no citizen suit provision authorizing private enforcement of its provisions; the plaintiffs argue that they can seek declaratory and injunctive relief against the defendant as a state official in the federal court by asserting a claim of preemption. More specifically, they argue that the Maine law is an obstacle to the realization of the aims of the federal law and, thus, the complaint states a claim for "stands as an obstacle," a.k.a. "conflict," preemption.[1]

---

[1]     The plaintiffs' construction of their "cause of action" raises a real concern in my mind as to whether there really is federal subject matter jurisdiction here. There is case law that supports a conclusion that the type of preemption argued by the plaintiffs is not an independent cause of action that can get you into the federal court door, but an affirmative defense to litigation brought against one. See, e.g., In re Methyl Tertiary Butyl Ether (""MTBE") Prods. Liab. Litig., 488 F.3d 112, 135 -36 (2D Cir. 2007); New Mexico v. General Elec. Co., 467 F.3d 1223, 1244 (10th Cir. 2006); Alderman v. SmartCity Telecomm., LLC, __ F. Supp. 2d __ __ & n.2, 2007 WL 570011, *2 & n.2 (M.D. Fla. Feb. 20, 2007) compare United States v. Massachusetts, __ F.3d __, 2007 WL 1775913 (1st Cir. June 21, 2007) (analyzing a hybrid field preemption/conflict preemption claim by the United States, as plaintiff, joined by intervenor-plaintiffs); Grand Canyon Dories, Inc. v. Idaho Outfitters and Guides Board, 709 F.2d 1250 (9th Cir. 1983) (analyzing complete preemption under Rice v. Santa Fe Elevator Corp, 331 U.S 218 (1947)).

        The defendant has not raised the jurisdictional concern, but it is this Court's obligation to examine the issue of federal jurisdiction sua sponte. With respect to the current posture of the case this issue has not been sufficiently briefed for me to attempt to include the issue in this recommendation. Suffice it to say that the case law I could find dealing with conflict preemption seemed to characterize the legal doctrine as an "affirmative defense."

        I do note that there are cases in which plaintiffs have sued the federal agency with responsibility for assuring that the WSRA is followed apropos protected lands. See e.g., Friends of Yosemite Valley v. Norton, 348 F.3d 789, 802-03 (9th Cir. 2003); Oregon Natural Res. Council v. Harrell, 52 F.3d 1499, 1501-502 (9th Cir. 1995); City of Klamath Falls v. Babbitt, 947 F.Supp. 1, 1 -4 (D.D.C. 1996). The plaintiffs here have not elected to pursue such a remedy from a federal agency. Whether this court has jurisdiction to

I recommend that the Court grant the motion to dismiss on the grounds that the complaint does not state a claim.[2]

## Discussion

### *The Federal Wild and Scenic Rivers Act*

The United States Congress enacted the Wild and Scenic Rivers Act (WSRA) in 1968.  The WSRA provides:

> It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that <u>the established national policy of dam and other construction at appropriate sections of the rivers of the United States</u> needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.

16 U.S.C. § 1271 (emphasis added).  On its face this declaration of purpose pertains to the national policy respecting dam and other construction on United States rivers.

In particular, section 1278 of the act provides as relevant to this dispute:

(a) Construction projects licensed by Federal Energy Regulatory Commission

The Federal Energy Regulatory Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse,

---

entertain an action against a State agency responsible for promulgating regulations under the WSRA pursuant to a conflict preemption "cause of action" is, in my view, a novel question, but because the issue has not been raised and because, at least at first blush, the issue of "conflict preemption" suggests the presence of a "federal question," I have proceeded to address the core issue regarding the nature of the claim.

[2] In this recommended decision I do not address the parties' discussion concerning sovereign immunity/failure to join the State of Maine as an indispensable party or whether or not the plaintiffs could be granted a permanent injunction under a Supremacy Clause theory should they succeed on their preemption claim because I see no need to reach those issues.  The plaintiffs' preemption claim fails on its merits because there is no express or implied conflict in the federal law which would govern this regulation by the State.

transmission line, or other project works under the Federal Power Act (41 Stat. 1063), as amended (16 U.S.C. 791a et seq.), on or directly affecting any river which is designated in section 1274 of this title as a component of the national wild and scenic rivers system or which is hereafter designated for inclusion in that system, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic Rivers System. No department or agency of the United States shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration, or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior or the Secretary of Agriculture, as the case may be, in writing of its intention so to do at least sixty days in advance, and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this chapter and would affect the component and the values to be protected by it under this chapter.

16 U.S.C.A. § 1278(a).

The section entitled, "Existing State jurisdiction and responsibilities," provides:

(a) Fish and wildlife
Nothing in this chapter shall affect the jurisdiction or responsibilities of the States with respect to fish and wildlife. Hunting and fishing shall be permitted on lands and waters administered as parts of the system under applicable State and Federal laws and regulations unless, in the case of hunting, those lands or waters are within a national park or monument. The administering Secretary may, however, designate zones where, and establish periods when, no hunting is permitted for reasons of public safety, administration, or public use and enjoyment and shall issue appropriate regulations after consultation with the wildlife agency of the State or States affected.

(b) Compensation for water rights
The jurisdiction of the States and the United States over waters of any

stream included in a national wild, scenic or recreational river area shall be determined by established principles of law. Under the provisions of this chapter, any taking by the United States of a water right which is vested under either State or Federal law at the time such river is included in the national wild and scenic rivers system shall entitle the owner thereof to just compensation. Nothing in this chapter shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

(c) Reservation of waters for other purposes or in unnecessary quantities prohibited
Designation of any stream or portion thereof as a national wild, scenic or recreational river area shall not be construed as a reservation of the waters of such streams for purposes other than those specified in this chapter, or in quantities greater than necessary to accomplish these purposes.

(d) State jurisdiction over included streams
The jurisdiction of the States over waters of any stream included in a national wild, scenic or recreational river area shall be unaffected by this chapter to the extent that such jurisdiction may be exercised without impairing the purposes of this chapter or its administration.

(e) Interstate compacts
Nothing contained in this chapter shall be construed to alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by any States which contain any portion of the national wild and scenic rivers system.

(f) Rights of access to streams
Nothing in this chapter shall affect existing rights of any State, including the right of access, with respect to the beds of navigable streams, tributaries, or rivers (or segments thereof) located in a national wild, scenic or recreational river area.

(g) Easements and rights-of-way
The Secretary of the Interior or the Secretary of Agriculture, as the case may be, may grant easements and rights-of-way upon, over, under, across, or through any component of the national wild and scenic rivers system in accordance with the laws applicable to the national park system and the national forest system, respectively: *Provided,* That any conditions precedent to granting such easements and rights-of-way shall be related to the policy and purpose of this chapter.

16 U.S.C. § 1284.

Congress provided that the national wild and scenic rivers system would be comprised of rivers:

> (i) that are authorized for inclusion therein by Act of Congress, or (ii) that are designated as wild, scenic or recreational rivers by or pursuant to an act of the legislature of the State or States through which they flow, that are to be permanently administered as wild, scenic or recreational rivers by an agency or political subdivision of the State or States concerned, that are found by the Secretary of the Interior, upon application of the Governor of the State or the Governors of the States concerned, or a person or persons thereunto duly appointed by him or them, to meet the criteria established in this chapter and such criteria supplementary thereto as he may prescribe, and that are approved by him for inclusion in the system, including, upon application of the Governor of the State concerned, the Allagash Wilderness Waterway, Maine;

16 U.S.C. § 1273(a).  Thus, from the WSRA's inception it was anticipated that Maine would seek (2)(ii) inclusion of the Allagash Wilderness Waterway into the national wild and scenic river system.

Subsection (b) of § 1273(a) of the WRSA provides:

> A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:
> **(1)** Wild river areas--Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.
> **(2)** Scenic river areas--Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.
> **(3)** Recreational river areas--Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

16 U.S.C. § 1273(b).   (As set forth below, the Allagash Wilderness Waterway obtained a subsection (1) status.)

Other provisions of the federal act that treat the state/federal relationship include that which provides that "lands owned by a State may be acquired only by donation or by exchange." 16 U.S.C. § 1277(a)(1). While the section of the Act that pertains to "Administration" addresses primarily administrative responsibilities vis-à-vis federally owned components of the system, <u>see</u> 16 U.S.C. § 1281 (a)-(d), subsection (e) provides:

> The Federal agency charged with the administration of any component of the national wild and scenic rivers system may enter into written cooperative agreements with the Governor of a State, the head of any State agency, or the appropriate official of a political subdivision of a State for State or local governmental participation in the administration of the component. The States and their political subdivisions shall <u>be encouraged to cooperate</u> in the planning and administration of components of the system which include or adjoin State- or county-owned lands.

16 U.S.C. § 1281(e) (emphasis added). Section 1282 of the Act requires:

> The Secretary of the Interior shall <u>encourage and assist</u> the States to consider, in formulating and carrying out their comprehensive statewide outdoor recreation plans and proposals for financing assistance for State and local projects submitted pursuant to the Land and Water Conservation Fund Act of 1965 (78 Stat. 897) [16 U.S.C.A. § 460l-4 et seq.], needs and opportunities for establishing State and local wild, scenic and recreational river areas.

16 U.S.C. § 1282(a) (emphasis added). Subsection (b) likewise directs that the Secretary of the Interior, the Secretary of Agriculture, or the head of any other federal agency,

> shall <u>assist, advise, and cooperate</u> with States or their political subdivisions, landowners, private organizations, or individuals to plan, protect, and manage river resources. Such assistance, advice, and cooperation may be through written agreements or otherwise. This authority applies within or outside a federally administered area and applies to rivers which are components of the National Wild and Scenic Rivers System and to other rivers.

16 U.S.C. § 1282(b)(1) (emphasis added).

Prior to Maine's efforts to bring the Allagash Wilderness Waterway under the WSRA umbrella, the Department of the Interior and the Department of Agriculture signed off in February 1970 on "Guidelines for Evaluating Wild, Scenic and Recreational River Areas Proposed for Inclusion in the National Wild and Scenic Rivers System …." (See Docket No. 1-3.)  These guidelines indicate, vis-à-vis all three categories of river area, that if after a 16 U.S.C. 1273(a)(ii) designation a State allows certain construction/ structural modification of the designated area, "such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river areas from the system."  (Id. at 6, 8-9 & 11.)

### *Allagash Wilderness Waterway's Designation as a Wild River Area under the WSRA*

On July 17, 1970, the following notice was issued by Department of the Interior, Office of the Secretary:

> Pursuant to the authority granted the Secretary of the Interior by section 2 of the Wild and Scenic Rivers Act (82 Stat. 906, 907) and upon proper application of the Governor of the State of Maine, the Allagash Wilderness Waterway, Maine, is hereby designated a State administered wild river area of the National Wild and Scenic Rivers System.

35 FR 11525-03.   In doing so the Department noted that the May 11, 1966, Maine Allagash Wilderness Act; "Provided permanent and exclusive administration of the entire watercourse by the Maine State Park and Recreation Commission."  Id. at 11525.  And: "the entire Allagash Wilderness Waterway is [to be] permanently administered without expense to the United States."  Id.

*Post-designation Federal Guidelines*

The defendant's motion to dismiss contains the following summary of the federal

guidelines and publications that were issued after the AWW was designated:[3]

> In 1982, the Department of the Interior and Department of
> Agriculture published guidelines for the Wild and Scenic Rivers System,
> which replaced the earlier 1970 guidelines. 47 F.R. 39454 (September 7,
> 1982). The guidelines relate that "some management principles obviously
> apply only to Federal lands within the River area." Id. at 39454.
>
>> Managing agencies will implement these principles to the fullest
>> extent possible under their general statutory authorities and
>> existing Federal, State and local laws. Because of these limitations,
>> however, implementation of the principles may differ among and
>> within components of the system depending on whether the land
>> areas involved are federally, state, locally or privately owned.
>
> Id. at 39459.
>
> The federal government has issued a number of other guidelines
> and publications regarding the National Wild and Scenic Rivers by the
> federal Interagency Wild and Scenic Rivers Coordinating Council ("the
> Council"). In 1996, the Council issued a technical report entitled
> Protecting Resource Values on Non-Federal Lands. (Most recently found
> at http://www.rivers.gov/publications/non-federal-lands-protection.pdf).
> The report explains that "there are no explicit standards for resource
> protection on nonfederal lands in the [WSRA] or Interagency Guidelines."
> Id., at 4.
>
>> Because designation ensures that a river will not be subject to
>> major new federal water resources projects, including new dams
>> and hydroelectric developments, it can be a strong river protection
>> tool. However, river systems are also affected by a variety of land
>> use decisions and water related policies over which the federal
>> government has little or no control…. [T]he protection from
>> damage associated with federal authorized projects that is
>> automatically afforded by WSR designation falls short of ensuring
>> the health of the river system as a whole. …[T]he [WSRA] seeks
>> to compensate for this "protection gap" in part by authorizing the
>> federal acquisition of land or easements within a congressional
>> designated river's boundaries. The additional protection needed to
>> protect such rivers for the benefit and enjoyment of future
>> generations can only be provided through the cooperation of State
>> and local governments, landowners, and other river-related
>> organizations.

---

[3] The plaintiffs do not take issue with these sources. I see no reason to recreate the wheel anew. The summary includes the defendant's own opinion as to the implication of the guidelines which I do not omit but which have not influenced my independent conclusions on the preemption question.

Id. at 6 & 7 (footnote omitted). There is no hint that the WSRA compels state or local government to implement a particular plan. Indeed, the guidelines express exactly the opposite.

In May of 1997, as revised in January of 1999, the Council issued A Compendium of Questions and Answers Relating to Wild and Scenic Rivers. (Most recently found at http://www.rivers.gov/publications/q-a.pdf). It explains:

> Private and State lands along rivers managed by State and/or local governments, and designated pursuant to Section 2(a)(ii) of the Act, are managed under State/local authorities and plans. The federal government exercises no authority over state or private lands and has no authority to acquire them under Section 2(a)(ii).

Id., at 1 (emphasis added). Rivers designated under Section 2(a)(ii) "continue to be administered by the State (sometimes with assistance from local governments), except for any federal lands along the river." Id., at 11-12. Regarding who protects rivers designated under the Section 2(a)(ii), the report states:

> The [National Park Service] does provide ongoing technical assistance and partnership efforts with local managers and stake holders in many of these rivers. Primarily, protection remains the responsibility of the state and/or local governmental entity, except where federal lands are involved. The Secretary of the Interior … would make determinations of effect on federal or federally assisted water resources projects pursuant to Section 7 of the Act.

Id., at 21. Regarding private lands, designation "neither gives nor implies government control of private lands within the river corridor," and the "federal government has no power to regulate or zone private lands under the Act; however, administrating agencies may highlight the need for amendment to local zoning." Id. at 34.

> Under the Act, the federal government has no authority to regulate or zone private lands. Land use controls on private lands are solely a matter of State and local zoning. Although the Act includes provisions encouraging the protection of river values through state and local government land use planning, there are no binding provisions on local governments. In the absence of state or local river protection provisions, the federal government may assure compliance by entering into agreements with landowners and/or through purchase of easements, exchanges, or acquisitions of private lands.

Id., at 37. Local governmental entities are encouraged by federal agencies to use their zoning power to protect WSRA values. Id.

> For rivers designated using Section 2(a)(ii) of the WSRA, the state is responsible for providing protection except on federally administered lands…. The role of local government depends on ownership along the WSR…. Where the WSR flows through private lands, local government can assist by using their regulatory

powers, e.g., zoning authority, to control land uses inimical to
protecting river values.

Id., at 64. Regarding motorized vehicles, "Generally, access routes within
the river corridor will continue to be available for public use….
Acceptability may be determined by historical or valid rights involved…."
Id. at 44.

In 1998, the Council issued An Introduction to Wild and Scenic
Rivers (Most recently found at http://www.rivers.gov/publications/wsr-
primer.pdf). The report explained that the "heart of river protection, and
the essence of the [WSRA] is protection of free-flowing character" of the
rivers from the effects of federal activities, in particular FERC licensing.
Id. at 3. The report reiterated that "For rivers designated under Section
2(a)(ii), a state agency is responsible, sometimes in concert with local
governments." Id.

In 2000, Designating Rivers Through Section 2(a)(ii) of the Wild
and Scenic Rivers Act was prepared for the Council. (Most recently found
at http://www.rivers.gov/publications/2aii.pdf). The report emphasized
that "[f]irst and foremost, the river is managed by state or local agencies,
except where federal lands are involved. While several of the more recent
Congressional designations mandate that the river be managed
cooperatively with local governments, Section 2(a)(ii) specifically
precludes federal management of the river...." Id. at 1.

(Mot. Dismiss at 16-19.)

***The Challenged Provisions of the Maine Allagash Wilderness Waterway Act***

The plaintiff's challenge the following provisions of the Maine Allagash

Wilderness Waterway Act (AWW):

Except as provided in this section, the bureau may determine the location
of access points, control stations and watercourse crossings within the
waterway.

**1. Spring, summer and fall motor vehicle access to
watercourse.** Spring, summer and fall access by motor vehicle to
the edge of the watercourse must be maintained at:

   **A.** Chamberlain Thoroughfare Bridge;
   **B.** Churchill Dam;
   **C.** Umsaskis Lake Thoroughfare;
   **D.** Henderson Brook Bridge;
   **E.** Michaud Farm; and
   **F.** Twin Brooks.

**2. Spring, summer and fall access by motor vehicle to existing
short trails.** Spring, summer and fall access by motor vehicle to

short trails existing on the effective date of this subsection and
leading to the watercourse must be maintained at:

    **A.** John's Bridge, limited to:

        **(1)** Unloading and access during the months of May
        and September;

        **(2)** Day use only with a permit from the bureau;

        **(3)** Parking outside the restricted zone; and

        **(4)** No vehicle access to the water's edge;

    **B.** Bissonette Bridge road, over the road existing on the
effective date of this paragraph to the trail existing on the
effective date of this paragraph to the water's edge;

    **C.** Finley Bogan, from the Inn Road to the top of the high
bank;

    **D.** Ramsey Ledge Campsite, limited to the motor vehicle
parking area behind vegetative screening. Self-contained
motor vehicle camping is allowed and canoe access is
allowed; and

    **E.** Indian Stream, by the trail existing on the effective date
of this paragraph.

....

**4. Permanent watercourse crossings.** Notwithstanding section
1876, subsection 1, only the following six bridges within the
waterway are permanent watercourse crossings:

    **A.** Henderson Brook Bridge;

    **B.** Reality Bridge, also known as Umsaskis Bridge;

    **C.** Churchill Dam Bridge;

    **D.** John's Bridge;

    **E.** Chamberlain Thoroughfare Bridge; and

    **F.** Allagash Stream Bridge.

Watercourse crossings may not be constructed at the locations of the
former Schedule Brook Bridge or the former Bissonette Bridge. Any right
or interest granted to any person by the State to construct or maintain a
bridge at those sites is extinguished.

12 M.R.S.A. § 1882(1),(2),(4).[4]

---

[4]     The defendant asserts: "Essentially, that law codified the status quo[,]" preserving "certain
traditional points of access and bridges previously identified in the State's plans and rules, while also
restricting other crossings." (Def.'s Mot. Dismiss at 19-21.) The plaintiffs, of course, dispute this
proposition which is why they brought this suit. If this factual question needed to be solved by this court it
would not be appropriate to do so in the context of this motion to dismiss.

*Complaint's Failure to State a Claim for Preemption*

The First Circuit recently summarized the strains of federal preemption as follows:

> The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal statutes and the regulations adopted thereunder have equal preemptive effect. Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982). A federal statute or regulation may preempt a state regulatory scheme in three relevant ways. First, Congress can expressly preempt state law by explicit statutory language. Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996). Second, Congress can enact a regulatory scheme "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," id. at 31 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)), also known as "field preemption". In such cases, state regulation will be invalid even if it does not directly conflict with federal laws or regulations. See, e.g., Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 167-68 (1942). Third, "federal law may be in 'irreconcilable conflict' with state law," Barnett Bank, 517 U.S. at 31, 116 S.Ct. 1103 (quoting Rice v. Norman Williams Co., 458 U.S. 654, 659  (1982)), also known as "conflict preemption."

SPGGC, LLC v. Ayotte, 488 F.3d 525, 530-31 (1st Cir. 2007) (footnote omitted).  The plaintiffs insist that their Supremacy Clause theory is one of "conflict preemption."  See supra footnote 1.

There are only a handful of federal and state cases that address "Wild and Scenic Rivers Act" and mention or discuss "preemption."    Only three of these are helpful in resolving the preemption question before this court, although they address county enforcement apropos federally owned lands respecting which there would be a stronger

argument for federal land use oversight than respecting the state-owned land involved in this suit.[5]

The plaintiffs in <u>Grand Canyon Dories, Inc. v. Idaho Outfitters and Guides Board</u>, 709 F.2d 1250 (9th Cir. 1983) argued that Idaho's regulation of commercial rafting activities along the Snake River – in particular the white-water rafting licensing requirements --  were preempted by a number of federal statutes, including the WSRA. This case focused on whether or not the series of federal statutes "evinced a clear and manifest purpose to preempt the area regulated." <u>Id.</u> at 1254.  With respect to the plaintiff's argument that "Congress's delegation of control over various aspects of its Snake River activities to the National Forest Service, the Bureau of Land Management, and the Coast Guard indicates preemptive intent," the Court reasoned:

> Provisions for regulation of campsites, land management, and general safety in United States waters do not indicate a clear and manifest intent to preempt state regulation of the outfitters and guides industry. Although federal regulations limit the number of persons that may operate on the Snake River, the regulations are directed toward control of federally-owned campgrounds. Further, the Wild and Scenic Rivers Act which authorizes the federal regulations expressly provides for concurrent state jurisdiction except for state regulations impairing the purposes of the federal act. 16 U.S.C. § 1284(d) (1976). The Outfitters and Guides Act, however, contributes to the federal goal of preserving scenic river areas. <u>See</u> Idaho Code § 36-2101 (1977).

<u>Id.</u> at 1255-56.

The plaintiffs' claim here is that the 2006 Maine statute does impair the purpose of the federal act and does not contribute to the goal of preserving scenic river areas. And if they are factually correct that the 2006 Maine statute works a modification of access to the riverway that is a material increase of the access allowed when the Allagash

---

[5]    <u>See</u> <u>VoiceStream Minneapolis, Inc. v. St. Croix County</u>, 212 F.Supp.2d 914, 929- 30 (W.D. Wis. 2002); <u>Boundary Backpackers v. Boundary County</u>, 913 P.2d 1141, 1147- 48 (Idaho 1996).

was initially classified as a wild riverway under the WSRA this case would support their position if the Allagash were federally administered.  The Snake River was under federal administration and, as discussed below, this is a difference of some significance with respect to the preemption question.

The Court of Appeals of Wisconsin addressed a preemption claim concerning the WSRA and the Lower St. Croix Riverway in Wisconsin v. St. Croix County, 668 N.W. 2d 743 (Wis. App. 2003).  In that case St. Croix County amended a riverway ordinance so that it did not apply to the portion of the Lower St. Croix River under federal administration, an action which made the county non-conforming with a State mandate to regulate this area.  Id. at 745.  Sued by the State, the County claimed that WSRA preempted its regulation of the federally administered areas and that the state law mandating the contrary was invalid.  Id.  The Court explained:

> The County relies on the provisions in the Act that specifically empower the State of Wisconsin and the State of Minnesota to continue to administer state parks and fish hatcheries that are within the federal zone, and to acquire lands in the federal zone, the use of which is consistent with the master development plan required by the Act. It is the County's position that these specified activities exclude other activities not specifically mentioned, such as those set out in the riverway zoning that it repealed. In contrast, the State contends that federal administration does not encompass zoning regulation; that local and federal regulations can co-exist in the federal zone so long as the local regulations do not conflict with the Act; and that there is no conflict here. We agree with the State.

Id. at 747.

In St. Croix County, unlike in this case, there was no argument that the State's zoning directive conflicted with the preservation policy underlying the WSRA.  See id. at 748-49.  The court concluded that the State still had the power to authorize zoning apropos federally managed areas.  Id. at 749.  "Furthermore," the court opined,

> given the Act's stated areas of federal and state cooperation, the absence of
> any explicit or implicit statement of federal preemption and the
> cooperation evidenced in the master plan, we conclude that the federal
> government has not preempted the regulation of the Lower St. Croix River
> in either the federal or the state zone.

Id. at 749.

This case supports the defendant in its conclusion that even as to lands in a federal zone, the host state and county still maintain zoning powers over WSRA designated areas. Of course, it is the plaintiffs' contention that the 2006 State law (which is in a sense an exercise of land use regulation like a zoning law) does conflict with the very purpose of the WSRA, maintaining the primitive qualities of the riverway.

In Kiernat v. County of Chisago, the United States District Court for the District of Minnesota addressed a law suit by owners of a riverside lot that was located in an area of the Lower St. Croix Riverway protected by the Wild and Scenic River Act, an area that was federally administered. See 564 F. Supp. 1089, 1091 (D. Minn. 1983). With respect to this designated riverway, a master plan was developed by the United States and the two home states, Minnesota and Wisconsin, which provided for federal acquisition in fee of some of the land and federal acquisition of scenic easements for the balance of the acreage. Id. For consideration, the federal government was granted a scenic easement vis-à-vis the plaintiffs' property, consistent with the WSRA. Id. at 1092. The existing cabin and deck burned down. The plaintiffs sought to rebuild and were discontent with the Chisago County's imposition of certain conditions on granting their request for a variance, above and beyond what the National Park Service and the town required. Id. at 1090, 93.

16

The plaintiffs argued "that defendant's exercise of its zoning authority [was] an impermissible abrogation of the terms of a federal land acquisition" given that the National Park Service had given them the go ahead.  Id.  at 1093.  The District Court rejected this claim, concluding that there was no attempt by the County to deny the federal government the exercise of its easement rights and the easement did not confer a federal right to act free from regulation by others.  Id.  The plaintiffs also argued that the County's restriction did not comply with the state and local law requiring the zoning be consistent with the WSRA, id., and the Court concluded that more stringent state or local regulations were not inconsistent with the WSRA, id. at 1094.

And, the Court addressed the plaintiffs' preemption claim:

> Finally, it is urged that state and local zoning is preempted by the Federal regulatory scheme permitting replacement of pre-existing structures in the same form and location. Congress has not expressed its intention to preempt this zoning, and compliance with both state and federal regulations is possible; therefore, only an implied intention of Congress could be a basis for preemption here. Northern States Power Company v. Minnesota, 447 F.2d 1143 (8th Cir.1971). The Act is replete with provisions suggesting cooperative regulation with the state and local government. See e.g. 16 U.S.C. §§ 1273(a), 1275(b), 1276(b) and 1281(e). Similarly, the Master Plan also envisions a cooperative effort, suggests zoning standards, and leaves land interests unacquired by the federal government within the primary responsibility of local government. These facts suggest there is neither a Congressional intention of preemption nor a pervasive federal regulatory scheme.

Id. at 1094.

Both sides of this case are familiar with the above cited case law, although they obviously highlight the bits and pieces that favor their side.  Their preemption arguments are as follows.

With respect to the purpose of the WSRA as it relates to the preemption inquiry, the defendant argues that the WSRA was aimed at protecting rivers from federal action,

specifically the licensing and funding of hydropower projects.  (Mot. Dismiss at 27.)  The plaintiffs insist: "The language, structure and legislative history of the WSRA, as well as the WSRA case law, clearly show that Congress' purpose in enacting the WSRA is to permanently protect the 'outstandingly remarkable values' of select rivers in the United States."  (Resp. Mot. Dismiss at 24)(emphasis added). "Thus," the plaintiffs argue, "once a state chooses the classification for its river – wild, scenic, or recreational – it must permanently administer the river to the standard called for by that classification."  (Id. at 26.)  With respect to the goal of preventing dams from ruining special rivers, the plaintiffs maintain, "such a narrow goal was not the singular purpose of the Act."  (Id. at 27.)  They cite to case law stemming from federally owned land that applied the act to the allowance of cattle grazing and hunting and fishing lodges in protected areas, as demonstrating that the WSRA is not solely about preventing the impact of dams.

The plaintiffs "strenuously argue" that a river cannot be downgraded or de-designated under the WSRA. (Resp. Mot. Dismiss at 32.)  They assert the WSRA does not contain such a provision which "makes sense in light of the fact that the very purpose of the Act is to provide permanent protection for certain rivers."  (Id. at 32-33)  "If a component of the National Wild and Scenic Rivers System could be downgraded in classification or taken out of the system altogether, then the word 'permanently' in Section 2(a)(ii) of the act would have no meaning."  (Id. at 33.)

The plaintiffs also argue that it is impossible to comply with the WSRA and the 2006 Maine statute because the latter contemplation of eleven motor vehicle access points directly conflicts with the former's "generally inaccessible except by trail" standard.  (Resp. Mot. Dismiss at 35-36.)  They also argue the 2006 Maine Statute

conflicts with the notice of approval in its contemplation of eleven motor vehicle access

points and six permanent rather than two temporary bridges.  (Id. at 36.)

For his part, after a lengthy discussion of the law and the statutes and guidelines,

the defendant sums up his argument very neatly:

> [T]he language of the WSRA makes clear, and the federal agencies
> confirm, there was no intent to preempt the field of state management of
> its own lands along designated rivers. The intent was that the states and
> their local governments would manage and administer such lands with
> encouragement and advice from the federal government. Similarly, there
> is no conflict because, again, the federal government has no management
> or regulatory authority over non-federal land along Section 2(a)(ii)
> designated rivers. In sum, the only recourse a citizen may have if the state
> is not managing its own lands in conformance with that citizen's views of
> the WSRA is to engage in the state political process, or ask the DOI to
> encourage different state management or to reclassify or withdraw the
> river from WSRA designation.

(Mot. Dismiss at 34.).

Examining the WSRA itself and the attendant guidelines and other publications, I

conclude that there is no conflict preemption of Maine conservation land use legislation

pertaining to the Allagash Wilderness Waterway.   This Court does not accord full

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

deference to the administrative guidelines concerning the WSRA, but they do carry

weight.   As the First Circuit has explained:

> Less formal interpretations-policy statements, guidelines, staff
> instructions, and litigation positions-are not accorded full Chevron
> deference. Davis & Pierce,[Administrative Law Treatise] § 3.5, at 119-20;
> see also Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 991
> (1st Cir.1995) (agency's litigation position not entitled to Chevron
> deference).
> ….
> This is not to say [an agency's] position would be entitled to no deference.
> An established administrative practice interpreting a statute may be
> entitled to deference even if not yet reduced to specific regulation.
> Philadelphia Gear, 476 U.S. [426,] 439 [(1986)]. Additionally, less formal

agency determinations may be accorded something less than full <u>Chevron</u> deference. Davis & Pierce, <u>supra</u>, § 3.5, at 122.

<u>Massachusetts v. F.D.I.C.</u>, 102 F.3d 615, 621 (1st Cir. 1996); <u>see also</u> <u>Zenith Radio Corp.</u> <u>v. United States</u>, 437 U.S. 443, 450 (1978).  The agency guidelines and publications cited above make it pretty clear that with respect to non-federal areas in WSRA waterways that the states, counties, and towns retain full regulatory power and it is the role of the federal agencies to cooperate and assist.   The objective of permanently protecting WSRA riverways does have more potential for a conflict preemption problem with respect to federally administered lands, as the case law discussed above suggests.   I simply do not find any case law, regulations, or publications supporting the plaintiffs' argument that the WSRA's aim of permanent preservation of the waterways overrides this regulatory power that remains with the State.  The entire scheme rests upon a cooperative venture between the State and federal governments.  And I agree with the defendant that, if push came to shove, the consequence of the State's failure to adequately preserve the area per the standards of a wild riverway would be a downgrading of its status or a removal of the Allagash from the auspices of the WSRA.  It certainly seems apparent that the Allagash is no longer "a wild, scenic river, generally inaccessible except by trail," if it ever was such a river, as it now has eleven motor vehicle access points and six permanent watercourse crossings.  If, as the plaintiffs maintain, the State of Maine through loose stewardship has 'downgraded' the Allagash from a wild riverway to a scenic, or perhaps, recreational riverway, there is no Congressional enactment that preempts what the State has done.   There is nothing in the WSRA or the case law interpreting it, that speaks in terms federal preemption of state control of state owned lands along the riverway.

*Conclusion*

For the reasons above I recommend that the Court grant the defendant's motion to dismiss (Docket No. 8).

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

August 20, 2007.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge